OPINION
{¶ 1} Jeffrey R. Buelow was found guilty by a jury in the Clark County Court of Common Pleas of two counts of burglary and one count of rape. He was sentenced to six months of imprisonment on one of the burglaries and to three years each on the other burglary and the rape, with the sentences to be served concurrently. The burglary convictions were merged for sentencing. Buelow was also fined a total of $12,500 and classified as a sexually oriented offender.
 {¶ 2} The undisputed facts underlying the offenses are as follows. The victim, E.R., and Buelow were students at Wittenberg University and dated during the 2001-2002 school year, when the victim was a junior and Buelow was a senior. At the end of that school year, the relationship ended because Buelow was moving to Alaska and the victim was headed to Europe for the summer. They kept in casual contact thereafter through phone calls and e-mail, but they were no longer dating, and the victim began to date someone else. E.R. and Buelow saw each other in Chicago over New Year's Eve (December 31, 2002) when they were visiting mutual friends.
 {¶ 3} E.R. graduated in the spring of 2003 and planned to start a job in Columbus in July. She moved into a house at 617 Woodlawn in Springfield with some friends during the intervening weeks. During that period, Buelow came back from Alaska for his brother's wedding and visited some friends in Springfield. He and E.R. met for lunch. A few days later, on the evening of June 20, 2003, Buelow called E.R. and made plans to meet up with her and some friends that night at a bar in Springfield. The group went to several bars together.
 {¶ 4} According to E.R., Buelow was making her uncomfortable by the time the group reached the last bar, and she confided this fact to a male friend who was bartending there. The friend offered to escort her home when the bar closed. When she got home, she spent some time on the phone with her boyfriend and went to bed. Two people were sleeping in the main room on the ground floor of E.R.'s house. Buelow went from the bar to the home of some other friends.
 {¶ 5} From this point, the stories diverge significantly. According to Buelow's statement to the police, he was hanging out with some friends after returning from the bar and decided to go to 617 Woodlawn to see if E.R. was still awake. When he got there, he could not see anyone inside, but the door was unlocked, so he entered. He went upstairs, heard the television on in E.R.'s room, and opened the door. He said E.R.'s name two or three times and touched her shoulder to wake her up. She sat up and smiled. Buelow asked E.R. if she wanted some company, and she said, "Of course I do." Buelow climbed into bed beside her, and they hugged and kissed for about ten minutes. E.R. suddenly began to cry and said that she had to go to the bathroom. Buelow stated that he waited about five minutes, then went to see if E.R. was okay by listening in the hall. E.R. came out of the bathroom and went into her housemate's room while Buelow remained in the hall. When he heard E.R. crying very loudly, he asked if everything was okay and the housemate told him to leave. Buelow "thought she was crying because we used to date and we hadn't seen each other in a long time."
 {¶ 6} According to E.R., she had been asleep in her room and had awoken to find her pants and underwear off with Buelow on top of her, penetrating her vagina with his penis. She pushed him off, grabbed some boxer shorts, and ran to a housemate's room, waking her and her boyfriend. At first, the housemate and her boyfriend were startled and confused. The housemate went with E.R. into the bathroom to try to calm her down and find out what had happened. E.R. was hysterical and crying very loudly. The boyfriend saw Buelow standing in the hallway, and Buelow explained that he was her ex-boyfriend. By varying accounts, either E.R., the housemate, or the boyfriend told Buelow to leave, and he did. One of the people who had been sleeping downstairs saw Buleow leave the house and saw him a short time later standing outside the house, where E.R.'s crying in the upstairs bathroom could be plainly heard. E.R. called her parents and her boyfriend. Sometime after they arrived, the police were also called. While the police were there, Buelow reappeared and gave the police a statement. E.R. later went to Community Hospital for a rape kit examination.
 {¶ 7} Buelow was indicted on two counts of burglary and two counts of rape. One count of rape was based on engaging in sexual conduct with another who was unable to resist or consent because of substantial impairment due to a physical condition, R.C.2907.02(A)(1)(c), and the other was rape by force, R.C.2907.02(A)(2). The rape by force count was dropped prior to trial. Buelow was convicted on the remaining three counts and was sentenced as described supra.
 {¶ 8} Buelow raises five assignments of error on appeal, many of which contain numerous sub-parts.
"Appellant was denied a fair trial and due process of law due to numerous and various instances of prosecutorial misconduct."
 {¶ 9} Buelow alleges numerous instances of prosecutorial misconduct. Many of his arguments relate to comments made by the prosecutor during the opening statement and in closing argument. Others allege the withholding of evidence and the introduction of improper evidence. We will address each of these arguments in turn.
 {¶ 10} Generally, prosecutors are entitled to considerable latitude in opening and closing arguments. Maggio v. Cleveland
(1949), 151 Ohio St. 136, 140, 84 N.E.2d 912; State v. Ballew,76 Ohio St.3d 244, 255, 1996-Ohio-81, 667 N.E.2d 369. A prosecutor may freely comment on what the evidence has shown and what reasonable inferences the prosecutor believes may be drawn therefrom. State v. Lott (1990), 51 Ohio St.3d 160, 165,555 N.E.2d 293. Indeed, in our adversarial system, prosecutors are not only permitted but also encouraged to argue fervently for conviction. State v. Stephens (1970), 24 Ohio St.2d 76, 82,263 N.E.2d 773; State v. Hart (1994), 94 Ohio App.3d 665, 671,641 N.E.2d 755. It is improper, however, for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused. State v. Smith (1984),14 Ohio St.3d 13, 13-14, 470 N.E.2d 883. The prosecution must also avoid insinuations and assertions which are calculated to mislead the jury. Id. at 15.
 {¶ 11} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. State v. Bey,85 Ohio St.3d 487, 494, 1999-Ohio-283, 709 N.E.2d 484; Smith,14 Ohio St.3d at 14. The focus of that inquiry is on the fairness of the trial, not the culpability of the prosecutor. Bey,85 Ohio St.3d at 495. In determining whether the prosecutor's remarks were prejudicial, the state's argument must be viewed in its entirety. Ballew, 76 Ohio St.3d at 255.
 {¶ 12} We will first address Buelow's arguments relating to comments made during the prosecutor's opening statement and closing argument. Buelow objects to the following: 1) the prosecutor's characterization of his statement to the police as a "confession" or "admission" of burglary; 2) the prosecutor's reference in opening argument to the "emotional violation" of the victim; 3) the prosecutor's comments on Buelow's failure to explain his side of the events; 4) various misstatements of fact and law; and 5) the prosecutor's expressions of his personal beliefs and opinions in an attempt to bolster the testimony of his witnesses.
 {¶ 13} The prosecutor's comments related to the alleged "confession" or "admission" were as follows:
 {¶ 14} "You're also gonna see that after [E.R.] was raped, this man gave a full written statement to the police, and you're gonna see that statement here as the trial goes on and you're gonna see in that statement he makes a full confession to the crime of burglary. It's written right there in his handwriting."
 {¶ 15} In his report to the police, Buelow made the following statements related to the alleged burglary:
 {¶ 16} "* * * I decided to go to [the victim's] house and see if she was still awake. I knocked on the door and peeked in the window but I didn't see anyone. The door was unlocked so I went inside and upstairs to see if [the victim] was still awake. I heard the T.V. on so I opened her bedroom door and she was lying in bed."
 {¶ 17} Insofar as it is pertinent to count one in this case, burglary is defined as trespassing in a habitation of any person when another person other than an accomplice of the offender is present or likely to be present. R.C. 2911.12(A)(4). Buelow claims that his statements did not admit any crime, did not address his guilt, and thus did not constitute a "confession" to burglary as the prosecutor suggested.
 {¶ 18} Buelow admitted facts, not a crime. However, those facts arguably constitute the offense of burglary as set forth in R.C. 2911.12(A)(4). Buelow stated that he had entered a house in which at least one person was sleeping, without invitation, through an unlocked door. The prosecutor acted within the wide latitude afforded to him in characterizing these actions as an admission of burglary during his opening statement and closing argument.
 {¶ 19} Similarly, the prosecutor's references to the "emotional violation" of the victim were within reasonable bounds. It surely came as no surprise to the jury that the victim of rape was left with emotional scars. We are unpersuaded that a few such references inflamed the passions of the jury or improperly encouraged conviction based on "the enormity of the crime."
 {¶ 20} Buelow also argues that the prosecutor expressed his own personal beliefs and opinions in closing argument. Buelow objects to the prosecutor's comment that he would not want to endure the intrusiveness of a rape kit exam. We find this comment to be insignificant. Although we agree with Buelow that the prosecutor's feelings about a rape exam were irrelevant and would have been better left unsaid, this comment was not inflammatory and it had no bearing on Buelow's guilt.
 {¶ 21} Further, Buelow objects to the following portion of the prosecutor's closing argument:
 {¶ 22} "[Defense counsel] wants you, throughout his questioning, to believe that [the victim] and the Defendant were more than friends, that something was going on that shows that they were gonna hook up this night. Not consistent with the evidence you've just heard. Even his witnesses got up there and said it was nothing. Nothing they did made me believe that theywere gonna hook up. As a matter of fact, she had a perfect opportunity. She was invited to the party. She said no. She decided to go home. She decided the night was over." (Emphasis added.)
 {¶ 23} Although it would have been better form for the prosecutor to refrain from the use of the first person and from reference to his own beliefs, taken as a whole, we cannot conclude that this comment amounted to prosecutorial misconduct. It was well established at trial that the victim had dated Buelow for several months approximately one year prior to the alleged rape. Defense counsel did question numerous witnesses about any suggestion of a rekindling of the romance on the night in question. The prosecutor did not act improperly by arguing to the jurors that the evidence did not support the inference that the victim had encouraged Buelow or that the romance had been rekindled around the time of the alleged rape. See State v.Williams (2003), 99 Ohio St.3d 439, 447-8.
 {¶ 24} Finally, Buelow objects to the prosecutor's comment in his opening statement that the victim had run into her housemate's room and stated: "He raped me, he raped me, get him out of there." The evidence presented at trial did not substantiate such a statement by the victim. Rather, her housemate testified that, when the victim ran into her room, "[s]he didn't bluntly state anything * * * I was just confused * * * I did ask her — I mean she never — I mean she never said anything. She kind of went around everything and then she told me that he — she woke up and he was inside her." Thus, the victim was less coherent than the prosecutor made her out to be, and he did misstate what the evidence would show. However, it was clear from the housemate's testimony that the victim did convey that she had been raped, although she did not use that word. As such, we find no prejudice to Buelow as a result of the prosecutor's comment.
 {¶ 25} Buelow also alleges numerous other instances of prosecutorial misconduct under this assignment of error. The first relates to psychological reports about the victim, particularly whether she suffered from post-traumatic stress disorder. Buelow claims that the state had the benefit of seeing a report from the victim's counselor, Sharon Bradley-Vary, but that the victim rescinded her consent to the use of this report before it had been provided to the defense. It appears from the record that this argument is factually incorrect. The victim rescinded her consent to the prosecutor's use of the records before those records were given to either side when she realized that the defense would have access to them. In other words, it appears that neither party had access to Bradley-Vray's records. Moreover, Buelow's argument that he was entitled to the records because the victim's psychological history may have been relevant to "a reduced ability to correctly and accurately perceive and relate events" is inapposite because all the records at issue involved counseling that occurred after the alleged rape. There is no evidence that the victim had received psychological counseling prior to the rape. In any event, on this record, it is entirely speculative that these records would have been of any benefit to Buelow or that he was prejudiced by not having access to them.
 {¶ 26} Buelow also claims that the prosecutor commented on his silence "as indicating guilt." Following his assertion that the victim had cried "rape" as she ran into her housemate's room, as discussed supra, the prosecutor suggested that it was odd that Buelow had not attempted to refute the victim's claim at that time or to ascertain why she was so upset. The prosecutor also questioned the witnesses who had been present in the house about whether Buelow had offered any explanation for the victim's behavior or had expressed confusion about her behavior. Buelow characterizes these questions and comments as "highly prejudicial and inflammatory" and as a violation of his right to remain silent.
 {¶ 27} Buelow's argument overstates his right to remain silent. The Fifth Amendment right to be free from self-incrimination and the Fourteenth Amendment right to due process preclude the use of a defendant's silence during police interrogation to prove his guilt. Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. This right has been applied to the defendant's silence post-arrest and post-Miranda
warnings, precluding the use of one's silence for impeachment purposes and as substantive evidence of one's guilt. Id.; Doylev. Ohio (1976), 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91;Wainwright v. Greenfield (1986), 474 U.S. 284, 298-299,106 S.Ct. 634, 88 L.Ed.2d 623. The U.S. Supreme Court has permitted pre-arrest, pre-Miranda silence to be used for impeachment.Jenkins v. Anderson (1980), 447 U.S. 231, 100 S.Ct. 2124,65 L.Ed.2d 86. The Supreme Court has not addressed the use of pre-arrest, pre-Miranda silence as substantive evidence of a defendant's guilt, but the Supreme Court of Ohio has held that the use of one's silence as substantive evidence of guilt "subverts the policies behind the Fifth Amendment." State v.Leach, 102 Ohio St.3d 135, 141, 807 N.E.2d 335, 2004-Ohio-2147, ¶ 30.
 {¶ 28} The flaw in Buelow's argument is that all of the cases that prohibit the use of one's silence as evidence of guilt — even the Leach holding that the use of one's prearrest, pre-Miranda silence violates the court's "sense of fair play" — do so only when silence is invoked in the presence of law enforcement officers. None, including the cases cited by Buelow, extend the constitutional protection to a defendant's behavior during the course of a crime or before law enforcement officers have become involved in the situation. See Doyle,426 U.S. at 618; State v. Geboy, 145 Ohio App.3d 706, 2001-Ohio-2214,764 N.E.2d 451. As such, the prosecutor did not act improperly in questioning witnesses about or commenting upon Buelow's actions as the events unfolded — including his failure to question why the victim was upset.
 {¶ 29} There was one instance in which the prosecutor asked the police officer who encountered Buelow at the scene of the reported rape about Buelow's demeanor and whether he had asked, "what's this all about?" The trial court sustained a defense objection to this question. Although this question may have run afoul of Leach, there is no possibility that Buelow was prejudiced by it in light to the trial court's refusal to allow the officer to answer and its instruction to the jury that the question should be disregarded.
 {¶ 30} Buelow also claims that the prosecutor tried to improperly introduce evidence of his prior bad acts in violation of Evid.R.404(B) by suggesting that Buelow had made unwanted advances toward the victim at a New Year's Eve party in Chicago several months earlier. Specifically, the victim testified, over defense objection, that Buelow had gotten into a large chair with her after a night of partying and had tried to get her to go somewhere with him. The victim testified that she had not known where he had wanted to go, and that he had not propositioned her for sex, but that he had made it clear that he wanted to be physical. She also stated that "it felt inappropriate."
 {¶ 31} Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Buelow contends that, through this questioning, the prosecutor "was suggesting that [Buelow] had previously attempted to commit Sexual Imposition against the complainant (attempting sexual contact when it is offensive or being reckless in so doing) (R.C. 2907.06)." We disagree. Buelow's conduct on New Year's Eve certainly was not a crime, and it would be a stretch to even say that it was "wrong" based solely on the victim's statement that it felt inappropriate. Buelow did apparently desist when the victim discouraged his advances. Moreover, this evidence was offered to show the progression of the relationship between the victim and Buelow and to lay the foundation for the nature of their relationship at the time of the offense. Viewed in context, it cannot be fairly said that the prosecutor used this evidence to mislead the jury into thinking that Buelow had committed prior sexual offenses.
 {¶ 32} Buelow also faults the prosecutor for eliciting testimony about the long term effects of the rape on the victim. He claims that there was a strong likelihood that this testimony would confuse or mislead the jury. We disagree. In our view, the prosecutor did not focus an undue amount of time on the long term effects of the rape on the victim. Moreover, any reasonable jury would anticipate some changes in behavior or attitude from a rape victim. We are unpersuaded that the prosecutor acted improperly or that Buelow was prejudiced by this inquiry.
 {¶ 33} Finally, Buelow lists numerous alleged misstatements of fact and law in the prosecutor's closing argument as evidence of prosecutorial misconduct. These include references to Buelow's sneakiness in entering the victim's house, a reference to a statement attributed to the victim that she had been "violated" when there was no testimony that she had used the that word, and accusing Buelow of crafting his story to cast himself in the best light when, at the time the statement was given, he had not been accused of a crime. All of these alleged misstatements reflect the prosecutor's version of the events, and thus his characterization of Buelow's conduct. They are within the wide latitude afforded to the prosecutor in closing argument.
 {¶ 34} The first assignment of error is overruled.
 {¶ 35} "Appellant was denied a fair trial and due process of law due to the ineffectiveness of trial counsel."
 {¶ 36} Buelow alleges numerous instances of ineffective assistance of trial counsel. We review these claims under the two prong analysis set forth in Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 37} Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. Strickland, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. Id. Deficient performance means that claimed errors were so serious that the defense attorney was not functioning as the "counsel" that the Sixth Amendment guarantees. State v. Cook (1992),65 Ohio St.3d 516, 524, 605 N.E.2d 70. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id. at 524-525.
 {¶ 38} Buelow's first argument is that trial counsel was ineffective in failing to object to all of the alleged instances of prosecutorial misconduct discussed under the first assignment of error. As we discussed supra, we do not find any serious instances of misconduct set forth therein, and none that caused prejudice to Buelow. Therefore, there is no reasonable probability that these failures to object affected the outcome of the trial.
 {¶ 39} Second, Buelow claims that his attorney was ineffective in failing to seek dismissal of the second count in the indictment after it was amended prior to trial. This count originally charged aggravated burglary, in violation of R.C.2911.11(A)(1), and was reduced to burglary, in violation of R.C.2911.12. Both offenses allege the elements of entering an occupied structure by stealth when another person other than an accomplice is present. The difference is that R.C. 2911.11(A)(1), as originally charged, alleges the infliction or attempt to inflict physical harm on another, whereas R.C. 2911.12 alleges a purpose to commit any criminal offense.
 {¶ 40} Buelow suggests that the change in the second count evinced a change in the victim's story between the time of the offense and the time of trial, necessitating the discovery of prior inconsistent statements, access to grand jury transcripts, and a continuance in the trial. Trial counsel did seek a continuance to review trial strategy in light of the change, but the trial court denied the motion, stating "I don't see how it would affect the Defense to have fewer charges to respond in court." Buelow apparently believes that trial counsel should have done more to "explore the discrepancy between the language of the charging instrument and the State's new-found trial strategy." We are unpersuaded, however, that this change was a significant one or that it necessarily shows that the victim made inconsistent statements about the offense. In making its probable cause determination, the grand jury could have reasonably presumed that the alleged rape had involved physical harm sufficient to establish aggravated burglary without a statement to that effect from the victim. There is absolutely no evidence in the record that the victim initially claimed to have suffered physical injury only to recant that testimony in light of the medical evidence. Moreover, like the trial court, we fail to see how the defense could have been prejudiced by the reduction in the charges. Trial counsel was not ineffective in failing to pursue this issue.
 {¶ 41} Third, Buelow argues that trial counsel should have sought (and been granted) a mistrial on the basis of a witness's statement that the victim's intercourse with Buelow had been "forced." This testimony came from the boyfriend of the victim's housemate when he was asked what the victim had said when she came into the housemate's room that night. Trial counsel objected on the basis of hearsay, but did not move for a mistrial.
 {¶ 42} We disagree with Buelow's contention that this comment had clearly warranted a mistrial, and that trial counsel was therefore ineffective in not asking for one. On the whole, the testimony of the housemate and her boyfriend described the victim's actions and statements as hysterical and incoherent when she came into their room and for some time thereafter. As such, it was fairly clear that the word "forced" was the witness's description of what he perceived to have happened, based on the victim's actions, and not necessarily a word that she had used herself. Moreover, it is likely that the jury did not recognize the significance of this characterization since it was not instructed on the offense of rape by force, R.C.2907.02(A)(1)(a). Buelow was tried only for rape in violation of R.C. 2907.02(A)(1)(c), which is defined as engaging in sexual conduct with another when the other person's ability to resist or consent is substantially impaired and the offender has reason to know of this impairment. We fail to see how one witness's reference to force could have warranted a mistrial when Buelow was not charged with an offense requiring proof of the use of force.
 {¶ 43} Finally, Buelow claims that trial counsel was ineffective in failing to object to the following exchange between the prosecutor and the victim:
 {¶ 44} Q: "So June 21st, 2003, did this man rape you?
 {¶ 45} A: "Yes."
 {¶ 46} We fail to see how this statement could have prejudiced Buelow. It was obvious from her testimony as a whole and from the fact that she pursued the case that she believed that she had been raped. Moreover, her statement does not appear to have been overly emotional or inflammatory. Buelow suggests that counsel should have objected, or moved that the question and answer be stricken, and the jury ordered to disregard the question. In our view, however, trial counsel acted very reasonably in reacting less aggressively to the victim's testimony.
 {¶ 47} The second assignment of error is overruled.
 {¶ 48} "Appellant was denied a fair trial and due process of law due to numerous errors by the trial court."
 {¶ 49} Buelow raises numerous alleged errors under this assignment of error, several of which we have already discussed under the first or second assignment. These include the denial of access to the victim's psychological records, the amendment of the charges prior to trial, comments on Buelow's silence, a witness's use of the word "forced" with respect to the nature of the sexual conduct when force was not an element of the offense as charged, the sufficiency of the evidence on stealth, and the trial court's failure to review the grand jury transcripts for inconsistencies in the witnesses' testimonies. Although Buelow goes on about these alleged errors at length, we are not inclined to discuss these matters further. We rely on our discussions supra.
 {¶ 50} The new issues raised by Buelow under this assignment fall into the following general categories: 1) the nurse who performed and testified about the rape kit had never been recognized as an expert; 2) the jury instructions on rape did not track the statutory language; and 3) the court failed to properly preserve the jury's questions during deliberations and to create a proper record of the jury's request that part of the transcript be reread.
 {¶ 51} Christina Aubel had been an emergency room nurse for many years and conducted the rape kit exam on the victim in this case. She testified extensively about her education and experience related to sexual assault examinations. She also testified at some length about her examination of the victim. Aubel testified that the results of the victim's examination were normal except for a spot outside the opening to the vagina where there was "just a very small, light, slight area of redness." She further testified that such redness could have been caused by "short-term penis-vaginal penetration," but that it could also have been caused by a finger or tampon. Buelow objected to some of the questioning of Aubel on the basis of "foundation," but he did not challenge her qualifications to testify as an expert at trial.
 {¶ 52} Failure to object at trial waives all subsequent arguments except for plain error. State v. Jones,91 Ohio St.3d 335, 343, 2001-Ohio-57, 744 N.E.2d 1163. "A plain error does not exist unless, but for the error, the outcome of the trial would have been different." State v. Joseph, 73 Ohio St.3d 450, 455,1995-Ohio-288, 653 N.E.2d 285. Because Buelow did not object to the trial court's failure to specifically rule on Aubel's qualifications, his argument is waived. The alleged error does not rise to the level of plain error because Aubel appears to have been well qualified and her testimony regarding the "little small, light, slight area of redness" around the victim's vagina was hardly damning. It cannot be said that, but for Aubel's testimony, the outcome of the trial would have been different.
 {¶ 53} Buelow also contends that the trial court's language was unduly narrow when it instructed the jury that it had to determine whether Buelow knew, at the time of the offense, that the victim's ability to resist or consent was substantially impaired because of her physical condition. Buelow apparently claims that he was prejudiced by the trial court's failure to include in its instructions the possibility that the victim'smental condition could have interfered with her ability to resist or consent. R.C. 2907.02(A)(1)(c) discusses impairment based on mental or physical condition, as well as advanced age. Only the victim's physical condition was mentioned in the indictment.
 {¶ 54} We fail to see how the trial court's omission of an alternate basis for finding Buelow guilty was "unfair" to him. He attempts to tie this argument to the psychological records that we have discussed supra. There has been no suggestion, however, that the victim was mentally impaired on the night of the offense and, as we have already discussed, the records in question did not relate to her mental condition prior to or at the time of the offense. This argument is without merit.
 {¶ 55} Buelow raises several more arguments related to the jury's deliberations. First, he claims that the court improperly handled a question from the jury. The question related to whether, on the offense of burglary set forth in count two, the jury was required to find two components: trespass and rape. We disagree with Buelow's characterization that the question was paraphrased when it was read into the record. From our reading of the transcript, it seems clear that it was read verbatim, although the form of the question was somewhat awkward. In response to the question, the court restated the elements of the offense. The foreman then asked a follow-up question: "So what you're saying, all of us need to know what was in his mind as he was touching the doorknob as he was going into that room, sir? Or that's where we're at on that one." The court then stated: "I see what you're saying. You want to know when the Defendant had to arrive at that purpose." The court then explained that it would have to go over that separate question with the attorneys before an answer could be provided. The judge apparently asked the jury to put the question in writing, although this request is not a part of the record. The jury then sent out a message that it no longer needed the question answered. However, the court did proceed to clarify that, under the definition of burglary under Ohio law, purpose to commit a criminal offense can be formed at any time during the trespass.
 {¶ 56} Immediately after this exchange, Buelow moved for a mistrial on the ground that "the jury now thinks that the Court's instructing them on how they should deliberate. * * * That's the province of the jury that we've overstepped their bound." The trial court overruled the motion after explaining that it wanted "to make sure that the jury was not proceeding with their deliberation on a mistaken idea of what the rule of law was."
 {¶ 57} It does not appear to us that the trial court's response to the jury in any way suggested the manner in which it should deliberate or overstepped the responsibilities of the jury. Indeed, the court's response to the jury's question — and its withdrawal of that question — was entirely proper.[1]
 {¶ 58} Second, Buelow argues that his post-trial motion for a mistrial should have been granted because the jury requested transcripts of the testimonies of certain witnesses, and the court "apparently decided and indicated in some fashion that in its opinion these were not necessary." This statement of the issue suggests, and Buelow concedes, that there is no evidence in the record of the actions of which he complains. It was incumbent upon the defense to create a record on these matters if it intended to argue that the trial court committed error in refusing to provide the transcripts. In the absence of any record on this matter, we must presume the regularity of the proceedings, including the absence of reversible error.
 {¶ 59} Similarly, Buelow contends that the jury requested a new jury charge form during deliberations "due to errors in one of them." None of these discussions were made a part of the record. As such, we can find no error.
 {¶ 60} The third assignment of error is overruled.
 {¶ 61} "Appellant's conviction is not supported by sufficient evidence and is against the manifest weight of the evidence."
 {¶ 62} Buelow argues that there was no evidence of stealth to support his burglary convictions, and that these convictions were therefore based on insufficient evidence and against the manifest weight of the evidence.
 {¶ 63} The sufficiency of the evidence is a term of art meaning that legal standard which is applied to determine whether the evidence is legally sufficient to support the verdict as a matter of law. State v. Thompkins (1997), 78 Ohio St.3d 380,386, 1997-Ohio-52, 678 N.E.2d 541, citing Black's Law Dictionary (6 Ed. 1990) 1433. When a reviewing court addresses a sufficiency of the evidence question, "the test is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." State v. Martin (1983),20 Ohio App.3d 172, 175, 785 N.E.2d 717.
 {¶ 64} Buelow entered an unlocked house in the middle of night while everyone inside the house was apparently asleep. He had not been invited into the house and, in entering the house, he did not wake the guests sleeping on the couches in the front room. Although there is no direct evidence that Buelow attempted to prevent the discovery of his presence in the house, the jury could have reasonably drawn this inference from his behavior. Thus, Buelow's convictions for burglary were supported by sufficient evidence.
 {¶ 65} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."Thompkins, 78 Ohio St.3d at 387, citing Martin,20 Ohio App.3d at 175. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin, 20 Ohio App.3d at 175.
 {¶ 66} Buelow contends that the following factors prevented a finding that he had acted stealthily: 1) the door had been unlocked; 2) "a party-like atmosphere had been in progress during the day and evening" during which residents and non-residents had come and gone from the house; 3) non-residents were sleeping in the house; and 4) he had been conspicuous about his presence, "standing in the hall, speaking to people in the house and being seen leaving the premises at a normal, not in a quick or furtive manner."
 {¶ 67} The jury did not clearly lose its way and create a manifest miscarriage of justice in convicting Buelow of burglary. Although people may have come and gone from the house earlier in the day and evening, there was no evidence of such activity in the house at the time that Buelow entered. Buelow's statement that he did not see anyone in the house, despite two people sleeping in the front room, permits the inference that the house was dark. One of the people sleeping in the front room testified that she was a light sleeper and believed that she would have heard a knock on the door, but she did not hear one. Moreover, it was undisputed that Buelow had not been invited into the house; the circumstances under which other non-residents came to be in the house were irrelevant. Similarly, Buelow's behavior after the victim woke other people in the house — standing in the hall, talking, and leaving at a normal pace — had no direct bearing on whether he had entered by stealth. Based on the evidence presented, the jury could have reasonably concluded that Buelow had entered the house surreptitiously. Therefore, Buelow's argument that his conviction was against the manifest weight of the evidence is without merit.
 {¶ 68} The fourth assignment of error is overruled.
 {¶ 69} "Cumulative errors deprived the appellant of a fair trial."
 {¶ 70} Under Buelow's fifth assignment of error, he argues that the cumulative weight of the errors denied him a fair trial. We have identified very few even arguable errors, and those that we have identified were clearly not prejudicial to Buelow. Such errors cannot form the basis of a reversal based upon cumulative error.
 {¶ 71} The fifth assignment of error is overruled.
 {¶ 72} The judgment of the trial court will be affirmed.
Brogan, J. and Young, J., concur.
[1] We note that Buelow likely moved for a mistrial at this juncture because, in his discussions with the court, the foreman had revealed that the jury had agreed on the existence of a trespass. This fact is irrelevant to the alleged error, however.